UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SIESTA SOL, LLC, Plaintiff, | : | |
| v. | : | CA 05-401 S |
| BROOKS PHARMACY, INC., Defendant. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Defendant's Motion for Summary Judgment (Document ("Doc.") #11) ("Motion for Summary Judgment" or "Motion"). The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the filings, listening to oral argument, and performing independent research, I recommend that the Motion be granted.

**Facts**

Plaintiff Siesta Sol, LLC ("Siesta Sol"), a Florida corporation, is a supplier of apparel products and specialty items which are sold on a seasonal basis. See Affidavit in Support of Opposition to Motion for Summary Judgment (Doc. #16) ("Kaplan Aff.") ¶¶ 1-2. From 2001 to 2004 Siesta Sol's major customer was Eckerd stores ("Eckerd"), id. ¶¶ 3, 5, although the two companies never entered into a written agreement, see Defendant's Statement of Undisputed Material Facts ("DSUF") ¶ 4. In July 2004 Eckerd was acquired by the Jean Coutu Group (PJC) USA ("Jean Coutu"), which also operates Defendant Brooks Pharmacy, Inc. ("Defendant" or "Brooks"). See DSUF ¶ 5.

In November 2004, at the request of Brooks, Siesta Sol met with representatives from Brooks. See Kaplan Aff. ¶ 7. The

Brooks representatives included two persons with whom Siesta Sol had dealt when the two were employed by Eckerd. See Kaplan Aff. ¶ 7. At this meeting there was a general discussion of the working relationship which existed between Siesta Sol and Eckerd, but nothing was said at the meeting regarding purchases for 2005. Id.

In January 2005, Brooks requested that Siesta Sol propose a spring seasonal apparel program for 1,406 Eckerd stores. See Kaplan Aff. ¶ 8; DSUF ¶ 8. The request was made by Brooks' representative, Donald Poitras.[1] See Kaplan Aff. ¶ 8. Siesta Sol submitted a proposal for a spring program which was accepted by Brooks. See DSUF ¶ 9; Kaplan Aff. ¶ 8. Siesta Sol required Brooks to confirm in writing the material terms of the agreement relative to the spring program, and Brooks did so. See DSUF ¶ 9.

On February 23, 2005, representatives of Brooks and Siesta Sol met again at Brooks' request. See Kaplan Aff. ¶¶ 10-11. In a meeting which lasted over three hours, Siesta Sol's representatives discussed the business which they planned to do with Brooks for calendar year 2005. See Kaplan Aff. ¶ 11. The business included the spring apparel program which had already commenced, as well as the summer, fall, and holiday programs. See id. Additional programs were discussed, but the "core business" of the summer, fall, and holiday programs was the focus of the meeting. See id. Siesta Sol presented Brooks with a document, entitled "Year at a Glance," which identified items to be sold, the price of some of the items, shipment dates, and other information. See id.; id., Exhibit ("Ex.") 2 (Year at a Glance).

According to Siesta Sol, during the meeting, Mr. Timothy Porter ("Mr. Porter") of Brooks "made it clear that Siesta Sol

[1] Donald Poitras is an employee of the Jean Coutu Group (PJC) USA who is responsible for purchasing apparel for Brooks and Eckerd. See DSUF ¶ 6.

would be the vendor for the 1,406 Eckerd Stores for the remainder of the year, those being the same 1,406 stores supplied by Siesta Sol in the spring 2005 apparel program." Kaplan Aff. ¶ 12. Mr. Porter also stated "that the business dealings between Siesta Sol and Eckerd would 'stay the same' for 2005 as between Siesta Sol and Brooks,"[2] id. ¶ 13, "that another company was supplying Brooks stores other than the 1,406 stores being serviced by Siesta Sol," id. ¶ 12, and "that 2006 business was not assured for Siesta Sol but would be based on the 2005 performance," id. Siesta Sol's representatives came away from the February 23, 2005, meeting believing that the relationship between Siesta Sol and Brooks had been solidified for the calendar year 2005. Id. ¶ 14; see also id., Ex. 4 (e-mail from Eltschlager to Kaplan of 3/10/05).

In March and April of 2005, Siesta Sol supplied Brooks' 1,406 Eckerd stores with summer apparel merchandise, in the quantities and at the prices which had been agreed to at the February 23rd meeting. See Kaplan Aff. ¶ 14. This was the same summer apparel program which Siesta Sol had supplied in past years to the Eckerd stores. Id.

On May 6, 2005, Siesta Sol's sales representatives, Bill and Pam Eltschlager (the "Eltschlagers"), sent an e-mail to Mr. Porter at Brooks, requesting an appointment for the week of May 16th "to meet to review ideas for Fall program." Affidavit of Timothy Porter (Doc. #13) ("Porter Aff."), Ex. 5 (e-mails). Mr. Porter replied on May 9, 2005, by e-mail:

> I will be available in mid June for a meeting. Until that time we will keep in touch via phone and email. Please contact at any time. The apparel program is still

---

[2] Documentary evidence supporting the making of this statement exists. Notes made by Mr. Porter regarding the February 23, 2005, meeting include the words "Stays the Same." Kaplan Aff., Exhibit ("Ex.") 3 (Notes of Donald Porter).

> in development. The timing for a meeting will be much better at that date.

Porter Aff., Ex. 5 (e-mails).

This e-mail apparently caused the Eltshlagers to become concerned because on May 11th they sent Mr. Porter the following e-mail:

> We need to discuss the items listed below[3] asap by e-mail or by phone. It is important that we discuss your commitment to the apparel program. Please arrange an appointment at your earliest convenience.
>
> In your earlier e-mail, you stated that the apparel program is still in development. When Rich [Kaplan] and I met with you on February 23, we had the understanding that we would be the supplier for all of these programs this year. Is this correct? We need to make the commitment on the inventory for these programs at this time to enable timely delivery of the quality merchandise your customers expect. We look forward to hearing from you.

Kaplan Aff., Ex. 5 (e-mails).

Mr. Porter responded the following day, May 12th, in an e-mail which stated:

> Siesta Sol is the supplier for the programs you are currently sending stores. The program in development is one geared to all stores which the Siesta Sol will be a compliment to, just as you are now. I hope there is no confusion in this. Please contact me at your earlier convenience.

Kaplan Aff., Ex. 5. Siesta Sol interpreted this response to mean

---

[3] Directly beneath the body of this e-mail were two headings: "IMMEDIATE" and "FALL." Porter Aff., Ex. 6. Under "IMMEDIATE" there was information about items to be sold "Memorial Day thru 4th of July ...," id., and also a statement that a "plan-o-gram" regarding "Back to School" would be sent to Brooks shortly, id. Under "FALL", there were three subheadings: "Fall 4-way program," "Halloween," and "Holiday Fleece." Id. The Eltshlagers' e-mail concluded with the statement: "We will look forward to working with you on these programs and visiting with you in the near future." Id.

that it would continue to supply the 1,406 Eckerd stores for the balance of the year, consistent with the agreement which Siesta Sol believed had been reached at the February 23, 2005, meeting. See Kaplan Aff. ¶ 17.

Two weeks later, on May 26, 2005, Brooks notified Siesta Sol that it had decided to terminate the relationship, DSUF ¶¶ 13-14, and that Brooks would not accept the fall or holiday apparel programs from Siesta Sol, see Kaplan Aff. ¶ 20. Mr. Poitras allegedly stated to Siesta Sol's Chief Executive Officer, Richard Kaplan ("Mr. Kaplan"), on or about June 10, 2005, that "we (Brooks) may have misled you." Id. ¶ 21. Siesta Sol continued to receive restocking orders on the summer apparel program until June 24, 2005. Id. ¶ 20.

**Travel**

Siesta Sol filed the instant action for breach of contract (Count I) and promissory estoppel (Count II) on September 21, 2005. The instant Motion for Summary Judgment was filed on July 6, 2006. See Docket. Siesta Sol filed its opposition to the Motion on July 20, 2006, and Brooks responded with a reply memorandum on August 3, 2006. See id. The Court conducted a hearing on the Motion on August 16, 2006, and, thereafter, took the matter under advisement. See id.

**Summary Judgment Standard**

"Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Commercial Union Ins. Co. V. Pesante, 459 F.3d 34, 37 (1st Cir. 2006)(quoting Fed. R. Civ. P. 56(c)); accord Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the

point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

The non-moving party, however, may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d at 53 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by

presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002)(quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993))(alteration in original)(internal quotation marks omitted).

**Discussion**

The basis for Defendant's Motion for Summary Judgment is the Statute of Frauds, which provides that a contract for the sale of goods for a price greater than $500 is not enforceable without some writing to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. See Memorandum in Support of Defendant's Motion for Summary Judgment ("Brooks' Mem.") at 3; see also R.I. Gen. Laws § 6A-2-201 (2001 Reenactment).[4] Brooks further argues that the doctrine of promissory estoppel cannot be applied to avoid the Statute of Frauds, see Brooks' Mem. at 6-9, and that even if such application were permissible, Siesta Sol has not satisfied the elements of a promissory estoppel claim, see id. at 10-11.

In opposition to the Motion, Siesta Sol argues: 1) that sufficient writings were made by Brooks and sent to Siesta Sol to confirm the contract; 2) that Siesta Sol partially performed the

---

[4] R.I. Gen. Laws § 6A-2-201 provides that:

> (1) Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

R.I. Gen. Laws § 6A-2-201 (2001 Reenactment).

contract which removes it from the Statute of Frauds; 3) that promissory estoppel is available in Rhode Island as an independent means of recovery; 4) that equitable estoppel is also available in Rhode Island to rebut Brooks' assertion of the Statute of Frauds defense; and 5) that the presence of genuine issues of material fact precludes the granting of the Motion. See Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Mem.") at 1. The Court addresses these arguments seriatim.

**1. Written Confirmation**

Siesta Sol points to two writings which it contends confirm the existence of a contract and remove the case from the Statute of Frauds under R.I. Gen. Laws § 6A-201(1) and 6A-2-201(2). See Plaintiff's Mem. at 4-7. The first writing is Mr. Porter's handwritten notation at the February 23, 2005, meeting that the relationship between Siesta Sol and Brooks would "stay the same," Kaplan Aff., Ex. 3, as the relationship which had existed in the past between Siesta Sol and the 1,406 Eckerd stores. See Plaintiff's Mem. at 5. The second writing is Mr. Porter's May 12, 2005, e-mail to the Eltschlagers:

> Siesta Sol is the supplier for the programs you are currently sending stores. The program in development is one geared to all stores which Siesta Sol will be a compliment to, just as you are now. I hope there is no confusion on this. Please contact me at your earliest convenience.

Kaplan Aff., Ex. 5. Siesta Sol contends that by this e-mail "Brooks confirmed that Siesta Sol was to be the supplier of the programs not currently being shipped but to be shipped ...." Plaintiff's Mem. at 5.

To be sufficient under § 6A-2-201(1), a writing must be "signed by the party against whom enforcement is sought or by his or her authorized agent or broker," R.I. Gen. Laws § 6A-2-201(1).

The first writing is not signed, and, thus, fails to satisfy this requirement.[5] While the second writing at least contains the typed name of the sender, "Tim Porter," Kaplan Aff., Ex. 5, neither writing "indicate[s] that a contract for sale has been made between the parties ...," R.I. Gen. Laws § 6A-2-201(1); see also Doral Hosiery Corp. v. Sav-A-Stop, Inc., 377 F.Supp. 387, 389)(E.D. Pa. 1974)("To be a confirmation of a prior oral contract the writing needn't expressly state that it is sent in confirmation of the prior transaction, but it must state that a binding or completed transaction has in fact been made.").

Further highlighting the insufficiency of the writings is the fact that there is no mention in either document of any specific merchandise, quantity, or price. See Doral Hosiery Corp. v. Sav-A-Stop, Inc., 377 F.Supp. at 389 ("The requirement that the writing state a quantity is mandatory, and a writing which fails to do so does not satisfy the Statute of Frauds."). Section § 6A-2-201(1) specifically provides that "the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." R.I. Gen. Laws § 6A-2-201(1). Because both writings are devoid of any reference to quantity, compliance with this limitation on enforcement would be impossible.

In short, I find that the writings are insufficient by wide margins to remove the case from the Statute of Frauds under Section § 6A-2-201(1). To the extent that Siesta Sol contends that the case law it has cited supports a contrary finding, see Plaintiff's Mem. at 5-7, such argument is rejected. The cases cited are factually distinguishable from the instant matter or otherwise inapplicable.

Turning now to § 6A-2-201(2), that section provides that:

---

[5] There is also no evidence in the record that the first writing was actually sent to Siesta Sol as opposed to being produced by Brooks in discovery.

> (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten (10) days after it is received.

R.I. Gen. Laws, § 6A-2-201(2). Siesta Sol contends that the second writing is sufficient to allow it to gain the benefit of the above exception to the Statute of Frauds. See Plaintiff's Mem. at 5. However, Siesta Sol appears to misapprehend the application of § 6A-2-201(2) which requires a confirmation from the party seeking the enforcement. Thus, in the instant matter the writing required by § 6A-2-201(2) must come from Siesta Sol and confirm the alleged February 23rd oral agreement to a degree sufficient to bind Siesta Sol. A writing from Brooks simply cannot satisfy the requirement of this Section.

The inapplicability of § 6A-2-201(2) to the instant matter is plain both from the wording of the statute and the applicable case law. "Section 6A-2-201(2) ... provides that between merchants failure to answer a written confirmation of an oral contract for the sale of goods worth $500 or more within ten days of its receipt **takes away from that party** the defense of the statute of frauds." Stanley-Bostitch, Inc. v. Regenerative Envtl. Equip. Co., 697 A.2d 323, 329 n.6 (R.I. 1997)(bold added). In Gestetner Corp. v. Case Equipment Co., 815 F.2d 806 (1st Cir. 1987), the First Circuit interpreted an identical provision in Maine's Uniform Commercial Code. See id. at 808. The First Circuit held that a letter from Case's patent counsel to Gestetner's national sales manager, which stated "that Case looked forward 'to its continuing role as exclusive dealer for Gestetner,'" id. at 809, and which Gestetner deliberately chose not to answer, was sufficient to overcome the lack of a written

contract and properly prove that Gestetner contracted to establish Case as the sole distributor of Gestetner's equipment, see Gestetner Corp. v. Case Equip. Co., 815 F.2d at 809. The holding clearly reflects that written confirmation was sent by Case, the party seeking enforcement of the contract. See id. at 809-10; see also Klockner, Inc. v. Fed. Wire Mill Corp., 663 F.2d 1370, 1376 (7th Cir. 1981)(finding acknowledgment by plaintiff, which confirmed placement of order and which was sufficient to bind plaintiff, satisfied similar provision of Illinois Statute of Frauds and defeated defendant's Statute of Frauds defense).[6]

In contrast, here the alleged written confirmations to which Siesta Sol points are writings authored by Brooks' representative. Even if the contents of either writing were sufficiently specific to hold Brooks to some contractual obligation (and the Court has already determined that they are not, see Discussion supra at 9), the effect of § 6A-2-201(2) is to make those writings enforceable against the recipient of the communications (Siesta Sol) unless it objected to them in writing within ten days after they were received. See R.I. Gen. Laws § 6A-2-2001(2). The provision requires both that the writings be sufficient against the sender and that the sender be the party seeking to use the writings to avoid application of the Statute of Frauds. Here not only are the writings on which Siesta Sol relies insufficient as against Brooks, but it is Siesta Sol, the recipient of the communications, which is seeking to use to them.

---

[6] To the extent that Siesta Sol relies upon Demirs v. Plexicraft, Inc., 781 F.Supp. 860 (D.R.I. 1991), as support for its argument that R.I. Gen. Laws § 6A-2-201(2) is satisfied by either of Mr. Porter's writings, see Plaintiff's Mem. at 6, the Court fails to find such support. Senior Judge Pettine made only passing reference to this exception to the Statute of Frauds. See Demirs v. Plexicraft, Inc., 781 F.Supp. at 863. He concluded that the question of whether the defendant was equitably estopped from invoking the Statute of Frauds had to be resolved prior to any Statute of Frauds decision. See id.

The only writing that even remotely might support Siesta Sol's position is the May 11, 2005, e-mail from the Eltschlagers to Mr. Porter asking about Siesta Sol's status with Brooks. See Reply Memorandum in Support of Defendant's Motion for Summary Judgment (Doc. #17) ("Brooks' Reply Mem.") at 3 (citing Kaplan Aff., Ex. 5). However, this e-mail does not evidence that the parties had reached an agreement. Rather, it reflects Siesta Sol's uncertainty as to whether Brooks had made an agreement and requests that Mr. Porter clarify whether "[Siesta Sol] would be the supplier for all of these programs this year." Kaplan Aff., Ex. 5. The e-mail identifies no merchandise and specifies no quantities. As Brooks aptly describes it, the e-mail "is evidence only that Siesta Sol did not know where it stood." Brooks' Reply Mem. at 3. As a matter of law, the May 11, 2005, e-mail is insufficient to bind Siesta Sol to anything and, therefore, cannot qualify as a written confirmation of a contract under § 6A-2-201(2).

In sum, the two writings which Siesta Sol contends constitute written confirmation of the alleged oral contract do not satisfy the requirements of either § 6A-2-201(1) or § 6A-2-201(2). Accordingly, Siesta Sol's first argument must be rejected.

**2. Partial Performance**

Siesta Sol contends that its partial performance removes this case from the Statute of Frauds. See Plaintiff's Mem. at 7. In support of this argument, Siesta Sol argues that:

> Just as Eckerd had done for the four prior years, Brooks agreed that Siesta Sol would be the 2005 supplier of seasonal apparel programs for 1,406 stores Brooks obtained from Eckerd. Kaplan Aff., ¶ 12. Siesta Sol, after the February 23, 2005[,] agreement, shipped the apparel for the summer program in part performance of the 2005 agreement and expended substantial sums to fulfill its total obligations for the rest of the programs in

> 2005. Kaplan Aff., ¶ 14, 18, and Exhibit 6.

Plaintiff's Mem. at 7.

The law applicable to partial performance in the context of contracts for the sale of goods is set forth in R.I. Gen. Laws § 6A-2-201(3)(c), which provides:

> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable,
>
> ....
>
> (c) With respect to goods for which payment has been made and accepted or which have been received and accepted (§ 6A-2-606).

R.I. Gen. Laws § 6A-2-201.

The meaning of the above provision is further explained by Comment 2 of the Official Comment.

> "Partial performance" as a substitute for the required memorandum can validate the contract only for the goods which have been accepted or for which payment has been made and accepted.

R.I. Gen. Laws § 6A-2-201, cmt. n.2 (2001 Reenactment).

It is clear from the above quoted statute and comment that Siesta Sol's contention that partial performance removes this case from the Statute of Frauds must be rejected. It appears to be undisputed that Siesta Sol did not deliver any merchandise for which it has not been paid. See Brooks' Reply Mem. at 4. It also appears to be undisputed that Brooks has not made any subsequent payments to Siesta Sol for merchandise which it has not received. See id. The Court is, therefore, compelled to agree with Brooks that "[w]ith neither goods delivered and accepted, nor payment made and accepted, the doctrine of part performance is simply inapplicable." Id.

The two cases cited by Siesta Sol in support of its

contention, Pearl Brewing Co. v. McNaboe, 495 A.2d 238 (R.I. 1985), and Baumgartner v. Seidel, 65 A.2d 697 (R.I. 1949), see Plaintiff's Mem. at 7-8, both involved the sale or conveyance of real estate. The Court finds that they are inapplicable to the instant matter which involves the sale of goods and is governed by a different section of the Statute of Frauds.

In short, the doctrine of partial performance applies only to those goods which have been paid for or delivered. The goods as to which Siesta Sol seeks enforcement of the contract have neither been paid for nor delivered. Siesta Sol's partial performance argument is accordingly rejected.

**3. Promissory Estoppel**

Siesta Sol argues next that the doctrine of promissory estoppel removes the case from the Statute of Frauds. See Plaintiff's Mem. at 8. It asserts that especially at the summary judgment stage this doctrine prevents judgment for Brooks. See id.

The Court notes initially that there is substantial case law which holds that the doctrine of promissory estoppel cannot be used to circumvent the Statute of Frauds. See C.R. Fedrick, Inc. v. Borg-Warner Corp., 552 F.2d 852, 857 (9th Cir. 1977)(applying California law and concluding that state supreme court would not render California Commercial Code's § 2-201(1) and (2) a nullity by extending the doctrine of estoppel to vendor's oral bids for sale and delivery of specific goods); Lige Dickson Co. v. Union Oil Co. of California, 635 P.2d 103, 107 (Wash. 1981)(en banc) (declining to adopt doctrine of promissory estoppel because it "would allow parties to circumvent the U.C.C." and joining "the other courts which limit the doctrine of promissory estoppel from overcoming a valid defense based on the statute of frauds contained within the Uniform Commercial Code"); Anderson Constr. Co. v. Lyon Metal Prods., Inc., 370 So.2d 935, 937 (Miss. 1979)

(noting that the court had previously "declined to diminish the effect of the statute of frauds by applying the principle of estoppel" and stating that "[t]o hold otherwise would destroy the purpose of the statute to prevent frauds and perjuries"); Farmland Serv. Coop, Inc. v. Klein, 244 N.W.2d 86, 90 (Neb. 1976)(rejecting plaintiff's promissory estoppel argument which would have rendered statute of frauds "nugatory" in case where plaintiff claimed defendants had orally agreed to sell it 90,000 bushels of corn); Del Hayes & Sons, Inc. v. Mitchell, 230 N.W.2d 588, 594 (Minn. 1975)(noting that jurisdictions which have adopted "restricted view [of promissory estoppel] do so because a promissory estoppel exception would likely render the statute of frauds nugatory"); Cox v. Cox, 289 So.2d 609, 613 (Ala. 1974) (finding no merit in plaintiff's contention that the oral agreements were enforceable because the defendants were equitably estopped from raising the defense of the Statute of Frauds); id. ("To admit the doctrine advanced by [plaintiff] that the defendants were estopped to raise the Statute of Frauds unless one of the exceptions was applicable, would be to utterly destroy the statute"); C.G. Campbell & Son, Inc. v. Comdeq Corp., 586 S.W.2d 40, 41 (Ky. Ct. App. 1979)(rejecting argument that exception should be permitted to the strict enforcement of the requirement of a written document contained in U.C.C. because "any attempt by the courts to judicially amend this statute which is plain on its face would contravene the separation of powers mandated by the Constitution"); Tiffany Inc. v. W.M.K. Transit Mix, Inc., 493 P.2d 1220, 1226 (Ariz. Ct. App. 1972)(allowing application of promissory estoppel only when there has been a misrepresentation that the Statute of Frauds has been complied with or there has been a promise to make a memorandum of an oral agreement). But see Warder & Lee Elevator, Inc. v. Britten, 274 N.W.2d 339, 342 (Iowa 1979)(holding that statute of frauds under

the Uniform Commercial Code did not displace "long recognized" doctrine of promissory estoppel in an action for breach of an oral contract to sell grain).

Two of the above cited cases are particularly instructive and relevant to the instant matter. In Lige Dickson Co. v. Union Oil Co. of California, 635 P.2d 103 (Wash. 1981)(en banc), the parties had a long-standing business relationship extending over many years during which they never executed a single written contract or purchase order. Id. Over a nine year period (with one exception) the plaintiff, a paving company, purchased all its liquid asphalt from the defendant. Id. When the price of asphalt rose suddenly, the plaintiff sought and allegedly received from defendant an oral guarantee against further increases for the quantity of liquid asphalt needed to satisfy the plaintiff's then existing contracts. Id. at 103-04. Several months later, the defendant refused to honor the guarantee, and plaintiff was forced to pay higher prices for liquid asphalt in order to perform existing contracts. Id. at 104.

In holding that promissory estoppel was not applicable to claims involving the sale of goods, the Lige Dickson court explained that:

> The Uniform Commercial Code was adopted to regulate commercial dealings.
>
> ....
>
> If we were to adopt [Restatement (Second) of Contracts] § 217A as applicable in the context of the sale of goods, we would allow the parties to circumvent the U.C.C. For example, to prove justifiable reliance (an element of promissory estoppel), the promisee may offer evidence of course of dealing between the parties, as plaintiff did in this case. The Official Comments to RCWA 62A.1-205(4) state that the statute of frauds
>
>> restrict(s) the actions of the parties, and ... cannot be abrogated by agreement, or by a

> *usage of trade* ...[.[7]]

Lige Dickson Co. v. Union Oil Co. of California, 635 P.2d at 107 (quoting RCWA 62A.1-205 at 71)(second and third alterations in original)(internal citation omitted).

In C.G. Campbell & Sons, Inc. v. Comdeq Corp., 586 S.W.2d 40 (Ky. Ct. App. 1979), the defendant submitted an oral bid to the plaintiff, a general contractor, to furnish items of kitchen equipment for the construction of a school building. Id. The plaintiff used this bid in calculating his bid price for the overall job and was awarded the contract. Id. The defendant discovered that it had overlooked the fact that four refrigeration units were required by the plans and refused to perform the work for the bid price. Id. The plaintiff sued the defendant for the difference between the defendant's bid and the actual cost of securing the kitchen installation from another source. Id. However, the trial court granted summary judgment to the defendant. Id.

On appeal, the plaintiff argued that equity should intervene to alleviate the harsh effects of Section 2-201 of the U.C.C., because inability to enforce performance of the bid offer would cause substantial loss to the contractor through no fault of his own and allow the oral bidder to escape all consequences of the loss caused by him. Id. at 40-41. Plaintiff contended that such intervention was especially warranted because the bidder knew that the contractor would use the bid price in formulating his bid. Id. at 40. In rejecting plaintiff's plea, the Kentucky Court of Appeals noted that:

> [T]he Uniform Commercial Code is a legislative attempt to achieve uniformity of law among the states as to commercial practices, and the limited relief provided by

[7] This same comment also appears in the Official Comment to R.I. Gen. Laws § 6A-1-205 n.4 (2001 Reenactment).

> 2-201(2) is as far as the legislature was willing to go. The policy this state shall adopt with respect to commercial practices is properly a legislative concern, and the language of the statute is not ambiguous.
>
> We believe any attempt by the courts to judicially amend this statute which is plain on its face would contravene the separation of powers mandated by the Constitution.

C.G. Campbell & Sons, Inc. v. Comdeq Corp., 586 S.W.2d at 41.

The Court finds the reasoning of the Lige Dickson and Campbell courts persuasive. The purpose of the Statute of Frauds "is to prevent fraud and perjury with respect to the agreements governed thereby requiring for their enforcement the more reliable evidence of some note or memorandum in writing signed by the patty to be charged, or his agent in his behalf." Cox v. Cox, 289 So.2d 609, 612 (Ala. 1974); see also Bourdon's v. Ecin Indus., Inc., 704 A.2d 747, 755 (R.I. 1997)("It is well established that the purpose of the Statute of Frauds is to guard against perjury by one claiming under an alleged agreement.") (internal quotation marks omitted).

The Court agrees with Brooks that a plaintiff should not be allowed to invoke promissory estoppel where it has failed to avail itself of the applicable exceptions to the Statute of Frauds. See Brooks' Mem. at 8. Siesta Sol had the opportunity to send a written confirmation of the alleged agreement of February 23, 2005, before the company was terminated as a vendor by Brooks in May of 2005. See id. It also appears that Siesta Sol did not seek a clarification of Porter's May 12, 2005, opaque response to the question of whether Siesta Sol was correct in its belief that it "would be the supplier for all these programs this year." Kaplan Aff., Ex. 5. Given Mr. Porter's expression of hope that there was "no confusion in this," id., and his request that Siesta Sol contact him at its "earliest convenience," id., Siesta Sol's failure to seek further written clarification

diminishes its claim of having been victimized by Brooks.

Siesta Sol concedes that "certain states may, by statute or case law, preclude promissory estoppel where the Statute of Frauds bars enforcement of an oral contract ...," Plaintiff's Mem. at 10, but it asserts that "Rhode Island is not one those states," id. As support for this assertion, Siesta Sol relies upon Judge Pettine's opinion in Demirs v. Plexicraft, Inc., 781 F.2d 860 (D.R.I. 1991), and a Rhode Island Superior Court opinion which was written by the present Chief Justice of the Rhode Island Supreme Court, Frank J. Williams, when he was a superior court judge, Tyler Finance, L.P. v. Worcester Co., C.A. No. 99-4315, 2001 R.I. Super. LEXIS 6 (R.I. Super. Ct. Jan, 25, 2001). See Plaintiff's Mem. at 8-10.

The Demirs case is distinguishable from the instant matter in a number of important respects. Demirs involved a written employment contract, 781 F.Supp. at 862, and the breach of an alleged provision of that contract for the transfer of stock, id. at 861. The case did not involve the sale of goods between merchants as here. Many of the courts which have refused to allow promissory estoppel to circumvent the Statute of Frauds have done so in the context of commercial transactions involving the sale of goods. See, e.g., C.R. Fedrick, Inc. v. Borg-Warner Corp., 552 F.2d 852, 857 (9th Cir. 1977)(pumps); Lige Dickson Co. v. Union Oil Co. of California, 635 P.2d 103 (Wash. 1981)(en banc)(asphalt); Anderson Constr. Co. v. Lyon Metal Prods., Inc., 370 So.2d 935, 937 (Miss. 1979)(steel lockers); Farmland Serv. Coop, Inc. v. Klein, 244 N.W.2d 86, 90 (Neb. 1976)(corn) ; Del Hayes & Sons, Inc. v. Mitchell, 230 N.W.2d 588, 594 (Minn. 1975)(soybeans); Cox v. Cox, 289 So.2d 609, 613 (Ala. 1974) (cotton); C.G. Campbell & Son, Inc. v. Comdeq Corp., 586 S.W.2d 40, 41 (Ky. Ct. App. 1979)(kitchen equipment); Tiffany Inc. v. W.M.K. Transit Mix, Inc., 493 P.2d 1220, 1226 (Ariz. Ct. App.

1971)("sealcoat chips" for highway project). Also, Judge Pettine determined in Demirs that the written contract was ambiguous, 781 F.Supp. at 862, and that the only way resolve the ambiguity was to admit parol evidence, id. at 863. In the instant matter, there is no written contract and no need to admit parol evidence.

It is true that Judge Pettine found that the issue of whether defendant should be equitably estopped from raising the Statute of Frauds defense (pertaining to the sale of securities, see R.I. Gen. Laws § 6A-8-319 (1991 Supp.)) needed to be resolved before any decision as to the applicability of the Statute of Frauds, Demirs, 781 F.Supp. at 863, and that this precluded the granting of summary judgment based on the Statute of Frauds, see id. at 864. However, for the reasons stated above, this Court is unpersuaded that Demirs requires that a similar approach be taken in this case.

With regard to Tyler Finance, 2001 R.I. Super. LEXIS 6, Siesta Sol suggests that, because Chief Justice Williams addressed sequentially arguments regarding the Statute of Frauds and promissory estoppel, he must have also determined (at least sub silentio) that Rhode Island law permits the use of promissory estoppel to prevent a defendant from asserting a Statute of Frauds defense against a claim based on the breach of an oral contract for the sale of goods between merchants. See Plaintiff's Mem. at 9-10. Otherwise, according to Siesta Sol, he could have simply stated that discussion of petitioner's promissory estoppel argument was unnecessary because it is unavailable in circumstances where the Statute of Frauds bars enforcement of an oral contract. See id.

The Court declines to make this assumption in the absence of evidence that the question of the doctrine's applicability was actually raised by at least one of the parties in the case. Chief Justice Williams, who found that there was insufficient

evidence to support a finding that a contract existed under promissory estoppel, may have addressed the promissory estoppel argument for the sake of completeness, or he may have concluded that it was simpler to rule that the doctrine was inapplicable to the facts of that case instead of determining its applicability on a broader basis. In short, the Court is unpersuaded by either Demirs or Tyler Finance that Rhode Island law allows the Statute of Frauds to be circumvented by promissory estoppel in the context of the sale of goods between merchants.

Siesta Sol also relies upon Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787 (2nd Cir. 1986), as support for its argument that it should be allowed to invoke promissory estoppel to overcome Brooks' Statute of Frauds defense. See Plaintiff's Mem. at 9-10. While the Esquire Radio court held that the defendant was equitably estopped from raising the Statute of Frauds, 804 F.2d at 794, the court also emphasized that the Statute of Frauds was inapplicable because the defendant's "obligation was fundamentally not for the purchase of goods but for payment for [the plaintiff's] services ...," id. at 795. This is plainly reflected in the following excerpt:

> [H]aving reneged on its promise to repurchase Esquire's spare parts inventories, upon which Esquire reasonably relied, Ward is equitably estopped from raising the Statute of Frauds. Further, under Uniform Commercial Code Section 2-201, N.Y.U.C.C. § 2-201 (McKinney Supp.1984-85), **the Statute of Frauds would not apply here**, since Ward's obligation was fundamentally not for the purchase of goods but for payment for Esquire's services in accepting delivery of, reimbursing "landed costs" for, and storing the spare parts. The buy-back arrangement functionally cast Esquire-although nominally a "vendor"-as a service affiliate of Ward for purposes of inventory control and expense deferment. To say that the arrangement was for the sale of goods is to ignore the terms and economic consequences of the arrangement.

Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., Inc., 804

F.2d at 794-795 (internal case citations omitted)(bold added). In the instant matter, it is absolutely clear that the alleged oral contract is for the sale of goods.

Esquire Radio also involved unique facts and undisputed egregious conduct on the part of the defendant. The plaintiff in Esquire Radio was repeatedly and unequivocally assured by the defendant's representatives that the defendant would repurchase the spare parts. Esquire Radio, 804 F.2d at 791-792. For example, in Esquire Radio the defendant's representative complained that the plaintiff's inventories of spare parts were not high enough. Id. at 792. When the plaintiff's vice-president responded that such parts were very costly, the defendant's representative replied, "I don't know what you are concerned about. We are going to buy them from you anyway. We are going to use them. You ought to carry more and not be so tight on the quantities." Id. Because the court in Esquire Radio determined that the Statute of Frauds was inapplicable to the plaintiff's claims and also because the case is factually distinguishable from the instant matter, the opinion does not persuade this Court that the doctrine of promissory estoppel may be invoked by Siesta Sol here.

As already discussed, the great weight of authority is against Siesta Sol's contention in this regard. While the Rhode Island Supreme Court has not addressed the issue directly, in Webster-Tapper Co. v. Eastern Hay Co., 98 A. 50 (R.I. 1916), a case involving an oral contract for the sale of oats between two merchants, the court refused to find that the defendant had waived his right to raise the statute of frauds in defense to the plaintiff's claim based on the parties' past dealings, id. at 51. The plaintiff sought to introduce evidence that for a number of years the parties had made oral contracts and also that grain dealers throughout the country customarily conducted their

transactions orally without regard to the statute of frauds of the various states. Webster-Tapper Co. v. Eastern Hay Co., 98 A. at 51. In upholding the trial justice's exclusion of this evidence, the court stated:

> The statute by its terms sets forth the conduct by which the buyer may be bound without a note or memorandum in writing signed by him or his agent. **Whatever may have been his conduct with reference to other transactions with the seller, and whatever may have been the conduct of others, in transactions as to which such persons have not desired to raise the defense of the statute, a buyer is not thereby precluded from interposing this defense as to any specific transaction.**

Id. at 51 (bold added).

Given the weight of the case law against allowing promissory estoppel to be used to circumvent the Statute of Frauds and the Rhode Island Supreme Court's disinclination to allow inroads on the protection afforded by that statute, this Court concludes that the state supreme court would hold that promissory estoppel is not available to defeat a defense based on the statute (R.I. Gen. Laws § 6A-2-201) in cases involving the sale of goods between merchants. See Southex Exhibitions, Inc. v. Rhode Island Builders Assoc., 279 F.3d 94, 98 n.2 (1st Cir. 2002)("Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts would take is relatively clear.'")(quoting VanHaaren v. State Farm Mut. Auto Ins. Co., 989 F.2d 1, 3 (1st Cir. 1993))(alteration in original). Accordingly, I find that promissory estoppel is not a remedy which is available to Siesta Sol to avoid the requirements of the Statute of Frauds.

Even if Rhode Island law permitted the use of promissory estoppel to defeat a Statute of Frauds defense in circumstances like those here, Siesta Sol is unable to satisfy the requirements

for promissory estoppel. "To invoke the doctrine of promissory estoppel, a promisee must demonstrate the existence of:

1. A clear and unambiguous promise;

2. Reasonable and justifiable reliance upon the promise; and

3. Detriment to the promisee, caused by his or her reliance on the promise." Dellagrotta v. Dellagrotta, 873 A.2d 101, 110 (R.I. 2005)(internal quotation marks omitted); Filippi v. Filippi, 818 A.2d 608, 626 (R.I. 2003)(same).

Regarding the first element, the Rhode Island Supreme Court has explained that:

> The terms of the promise must be certain, for there can be no promissory estoppel without a real promise. Promissory estoppel cannot be based upon preliminary negotiations and discussions or on an agreement to negotiate the terms of a contract.

B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d 675, 677 (R.I. 1985)(internal citation omitted). Siesta Sol is unable to show that Brooks made a clear and unambiguous promise. The affidavit from Mr. Kaplan which Siesta Sol has submitted in opposition to the Motion attests that at the February 23rd meeting Mr. Porter: 1) stated "that the business dealings between Siesta Sol and Eckerd would 'stay the same' for 2005 as between Siesta Sol and Brooks," Kaplan Aff. ¶ 13; 2) said "that the quantities would have to be the same as in the past so that Siesta Sol's four-way fixtures would be fully stocked," id. ¶ 12; 3) "made it clear that Siesta Sol would be the vendor for the 1,406 Eckerd Stores for the remainder of the year ...," id.; and 4) indicated "that 2006 business was not assured for Siesta Sol but would be based on the 2005 performance," id. Based on these statements, Plaintiff asserts that Defendant "promised that Siesta Sol would have business from Brooks through the end of 2005, with a possibility of business in 2006 based on 2005 performance by Siesta Sol." Plaintiff's Mem. at 10 (citing

Kaplan Aff. ¶ 12). Promissory estoppel, however, cannot be based on an agreement to negotiate the terms of a contract, see B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d at 677.

Siesta Sol alleges in the Complaint that in making the alleged oral contract in February 2005, Brooks acted "consistent with past practice ...," Complaint ¶ 5. In describing this "past practice," Siesta Sol acknowledges that purchasing "worked by our presenting a program at the beginning of the season and Eckerd would select the items they wanted and that was that. It worked for each season, a spring/summer program and a fall/holiday program." Plaintiff's Answers to Defendant's Interrogatories, Answer to No. 11. Thus, the agreement to purchase particular items of apparel was not made until Eckerd selected the items it wanted. This is also evident from the deposition testimony of Mr. Kaplan, Siesta Sol's CEO, as he explained the relationship which he had with Mike Ahern, the Eckerd manager responsible for purchasing apparel:

> A. .... So, what he would say is, Rich, I want about, you know, 10 to 12 items. So I would go out, look at the marketplace and present to him for his choosing what is happening in the market and then we would review these and then we would talk strategy about them in terms of, okay, what's going on in the four-way programs,[8] what's

---

[8] "Four-way programs" apparently refers to the apparel which was displayed on four-way fixtures in the stores. As Mr. Kaplan explained:

> [W]hen we rolled out the apparel program, we rolled out these fixtures, they were the four-way fixtures. They have four arms. Each arm normally would reflect a different program, and sometimes they were -- more than one program was on one arm but, theoretically, one arm could be printed adult T-shirts, one arm could be printed kids T-shirts, one arm could be solid women's shirts, another arm could be fleece. You know, it varied according to the season.

Kaplan Dep. at 17-18.

going on in the in-line programs[9] and what items do we want, and so we would check it off accordingly. So that's what this was.

Q. So, he would go through a document similar to that and talk to you about the different options, and then he would make a decision as to which items he wanted and how much of the items he wanted?

A. Right.

Q. And did you negotiate price?

A. We would talk price ....

....

Q. But did you -- how did you arrive at the price for any order?

A. They would give us a sense for what their retail prices were, and what they needed to be and then we would try to back into the cost.

....

Q. So there was a give-and-take, fair to say?

A. There was a give-and-take relative to what the prices were and what the items are. There was a firm commitment that we had the business and we were going through the process to select the items for the business.

---

[9] The "in-line program" was referenced by Mr. Kaplan in an earlier response:

> So you had your spring assortment, then you had the spring/ summer, which was short sleeves, including printed goods, and then you had your fall program which transitioned to long sleeves, also included printed goods, and then there was another program that they had which is what they called in-line. That was for more apparel, for more space, where they would program out programs from us that would go in-line as well.

Kaplan Dep. at 18.

> Q. Right. But they weren't under any obligation to purchase any individual item?
>
> A. Not until we chose it or not until it was approved at an earlier time.

Kaplan Dep. at 20-24.

It is also clear from Mr. Kaplan's testimony that typically orders from Eckerd were confirmed in writing:

> Q. All right. So your typical process with Eckerd was to confirm all the orders in writing just to make sure that everybody was on the same page?
>
> A. It was a confirmation of details.
>
> Q. In terms of **-- details being item**, **price**, **quantity**, **delivery dates**, **correct**?
>
> A. **Yes**. It could include all of those or a few of them.
>
> ....
>
> Q. So you're confirming the commitment of Eckerd and your commitment in writing not as to the fact that they're buying shirts, but as to the fact that they are buying a certain number of shirts at a certain price and that they will be delivered in a certain time and any other details that are important to make sure the parties mutually understand?
>
> A. Yes. For the most part, yes.

Kaplan Dep. at 35-37 (bold added).

Kaplan also testified that while Siesta Sol's business with Eckerd increased incrementally each year, there was no written agreement between them which required Eckerd to purchase "a set dollar volume of merchandise[.]" Kaplan Dep. at 30. The verbal agreement, according to Kaplan, was that Siesta Sol would be Eckerd's apparel vendor, see id. at 26, and that Eckerd would purchase some combination of merchandise, consisting of whatever items might be selected by Eckerd, in sufficient volume to fill

the four-way fixtures in all of the stores, see id. at 28, 30.

This past practice demonstrates that Mr. Porter's statements do not rise to the level of being "a clear and unambiguous promise." Dellagrotta v. Dellagrotta, 873 A.2d at 110. It is plain that prior to the receipt of written confirmation, there was no agreement between Siesta Sol and Brooks as to: 1) the sale of any particular item of apparel; 2) the price of that item; and 3) the quantity of that item being purchased and sold.[10] Even assuming that Mr. Porter's statement(s) constituted a promise that Brooks would continue to purchase apparel from Siesta Sol in an amount sufficient to stock the four-way fixtures, in the absence of any agreement obligating Brooks to purchase a particular dollar amount of apparel, such a promise is little more than a promise to negotiate the terms of a contract which will satisfy this goal. Such an agreement cannot satisfy the first element of promissory estoppel. See B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d at 677 ("Promissory estoppel cannot be based upon ... an agreement to negotiate the terms of a contract."); id. ("The terms of the promise must be certain, for there can be no promissory estoppel without a real promise.").

Moreover, as previously noted, "[w]hatever may have been [its] conduct with reference to other transactions with the seller ... a buyer is not thereby precluded from interposing this

[10] Although the "Year at a Glance" document which Siesta Sol presented at the February 23, 2005, meeting included a "Unit Cost" and "Unit Retail" price for a few fall and Christmas items, see Kaplan Aff., Ex. 2, it is clear that the former figure was subject to negotiation, see Kaplan Dep. at 21-22, and that the latter figure was a suggested price, see id. at 29. The "Year at a Glance" document provides nowhere near the detail which is contained in the spring-summer catalogue, see Porter Aff., Ex. 1, and Mr. Porter was never provided with a catalogue of fall or holiday merchandise, see Porter Aff. ¶ 13. He never selected any fall or holiday products, never agreed to purchase any quantities of such products, and never discussed or agreed to pay a particular price for them. See id.

[Statute of Frauds] defense as to any specific transaction." Webster-Tapper Co. v. Eastern Hay Co., 98 A. at 51. Thus, Brooks is not precluded from raising the Statute of Frauds defense with regard to Siesta Sol despite its prior conduct.

In summary, the Court finds that the statements attributed to Brooks' representatives on which Siesta Sol bases its claim for promissory estoppel do not individually or collectively constitute a clear and unambiguous promise. Thus, even if Rhode Island law allowed promissory estoppel to circumvent the requirements of the Statute of Frauds, Siesta Sol cannot satisfy the first element required for application of that doctrine.[11] Additionally, prior practice does not prevent Brooks from asserting the Statute of Frauds defense. Siesta Sol's second argument, therefore, should be rejected.

---

[11] Siesta Sol further claims that it took action on Brooks' promise to its detriment. Plaintiff's Mem. at 10 (citing Kaplan Aff. ¶ 18). Specifically, Siesta Sol's CEO, Mr. Kaplan, states that:

> In furtherance of Siesta Sol's obligation to comply with program requirements for the fall seasonal apparel program, Siesta Sol expended approximately $62,000 from March 1, 2005[,] through May 26, 2005 .... This was pursuant to and in accordance with the February 23, 2005[,] agreement and confirmations that things would "stay the same" for Siesta Sol for 2005 as well as the logical outcome of the shipment of the summer apparel in March and April 2005.

Kaplan Aff. ¶ 18. Kaplan also affirms that Siesta Sol refrained from seeking other business because the large rush of orders of Brooks for the spring seasonal apparel program put Siesta Sol to full capacity and that Siesta Sol was dependent upon Brooks' business and had to concentrate entirely on Brooks. Id. ¶ 19.

These facts would be relevant to the second and third elements of promissory estoppel. However, as Siesta Sol is unable to satisfy the requirement for the first element, it is unnecessary to address the second and third elements.

**4. Equitable Estoppel**

Siesta Sol argues that equitable estoppel also prevents summary judgment from entering in Brooks' favor based on its asserted Statute of Frauds defense. See Plaintiff's Mem. at 10-11. "Under the doctrine of equitable estoppel, a party may be precluded from enforcing an otherwise legally enforceable right because of the previous actions of that party." Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d 58, 67 (R.I. 2005). The doctrine requires:

> an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and ... that such representation or conduct did in fact induce the other to act or fail to act to his injury.

Id. (quoting Southtex Exhibitions, Inc. v. Rhode Island Builders Assoc., 279 F.3d 94, 104 (1st Cir. 2002)(quoting Providence Teachers Union v. Providence Sch. Bd., 689 A.2d 388, 391-92 (R.I. 1997))). However, equitable estoppel applies "to representations made as to facts past or present." East Providence Credit Union v. Geremia, 239 A.2d 725, 727 (R.I. 1968). It is inapplicable as to future events. See Croce v. Whiting Milk Co., 228 A.2d 574, 578 (R.I. 1967)(agreeing that "the doctrine of estoppel would not be applicable here because the representation upon which its invocation rests relates to a future event and an estoppel does not lie in such circumstances"); Anderson v. Polleys, 173 A. 114, 116 (R.I. 1934)("The doctrine of estoppel by representation is ordinarily applicable only to the representation as to facts, either past or present, and not to promises concerning the future, which if binding at all, must be binding as contracts."); see also East Providence Credit Union v. Geremia, 239 A.2d at 727 (explaining difference between equitable estoppel and promissory

estoppel).

Plaintiff asserts "that Defendant promised that Siesta Sol would have business from Brooks through the end of 2005, with a possibility of business in 2006 based on 2005 performance by Siesta Sol." Plaintiff's Mem. at 10 (citing Kaplan Aff. ¶ 12). As this promise clearly relates to future events, the doctrine of equitable estoppel is unavailable. See East Providence Credit Union v. Geremia, 239 A.2d at 727; Croce v. Whiting Milk Co., 228 A.2d at 578; Anderson v. Polleys, 173 A. at 116 (citing Ins. Co. v. Mowry, 96 U.S. 544, 24 L.Ed. 674 (1877)); see also Ins. Co. v. Mowry, 96 U.S. at 547 ("An estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made."); id. at 548 ("[T]he doctrine has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the person complaining is to be a party. He has it in his power in such cases to guard in advance against any consequences of a subsequent change of intention and conduct by the person with whom he is dealing. For compliance with arrangements respecting future transactions, parties must provide by stipulations in their agreements when reduced to writing."); Stanley Educ. Methods, Inc. v. Becker C.P.A. Review Course, Inc., 536 F.2d 86, 90 (5th Cir. 1976)("Since the discussions pertained, not to present facts, but to future intentions, the third element of an equitable estoppel is missing ....")(applying Texas law); cf. Romano v. Retirement Bd. of Employees' Retirement Sys. of State, 767 A.2d 35, 47 (R.I. 2001)(Weisberger, C.J., concurring in part) ("[O]ur case law as well as that of the United States Supreme Court precludes the application of equitable estoppel into the future.").

Thus, equitable estoppel is not available to Siesta Sol in the instant matter. Even if it were available, equitable

estoppel is extraordinary relief which will not be applied unless the equities clearly are balanced in favor of the party seeking relief. Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d at 67. It is an equitable device that is applied, if at all, by the trial justice. Zarrella v. Minnesota Mut. Life Ins. Co., 824 A.2d 1249, 1261 n.13 (R.I. 2003). This Court does not find that the equities are clearly balanced in favor of Siesta Sol. As previously noted, it had the opportunity to avail itself of an exception to the Statute of Frauds by sending a letter to Brooks confirming the agreement it alleges was reached at the February 23rd meeting. Additionally, it failed to seek further written clarification of Porter's May 11, e-mail notwithstanding his invitation that it contact him. Given that Siesta Sol is seeking to hold Brooks to a $500,000 contractual obligation without any writing which complies with the Statute of Frauds, Siesta Sol's inaction diminishes its claim that it is entitled to extraordinary relief. See Complaint ¶¶ 5, 10; id., Prayer for Relief.

**5. Disputed Issues of Material Fact**

The Court has carefully reviewed Plaintiff's Statement of Disputed and/or Undisputed Facts (Doc. #15) ("PSDF") and also the Kaplan Aff. for any disputed issue of material fact which precludes the granting of the instant Motion. There is none. A number of the statements in the PSDF are really nothing more than Siesta Sol's legal contentions based on its interpretation of the facts. See, e.g., PSDF ¶ 2 ("Siesta Sol had a binding agreement with Eckerd, which Brooks, as successor, was obligated to fulfill."); id. ¶ 3 ("Porter did contract for Brooks for purchases under the seasonal apparel program for Brooks with Siesta Sol for the balance of 2005"); id. ¶ 4 ("On February 23, 2005, Mr. Porter entered into an agreement, on behalf of Brooks, for the purchase of summer, fall and holiday seasonal apparel,

not just fall and holiday."); id. ¶ 5 ("On May 12, 2005, Mr. Porter confirmed to Siesta Sol, through e-mail to B & P Sales, that Siesta Sol would remain the supplier for the programs.").

Although Siesta Sol states in the PSDF that at the February 23rd meeting its representatives "discussed quantity, price and other terms for all the seasonal programs, including fall and holiday season apparel," PSDF ¶ 7 (citing Kaplan Aff. ¶ 11), there is nothing in the Kaplan Aff. which contradicts Mr. Porter's affirmations that, at least as to the fall and holiday apparel programs which are the ones at issue in this lawsuit, he "never selected any products, ... never ... agreed upon purchasing any set quantities of products, and ... never ... agreed to purchase any dollar value or set any price on any merchandise," Porter Aff. ¶ 13. In fact, Siesta Sol does not contend that an agreement was reached at the February 23rd meeting as to quantities and prices for the fall and holiday apparel, although it does make this claim as to the summer apparel program, see PSDF ¶ 11. Thus, Siesta Sol is unable to show that there was any agreement relative to the material terms for the sale of the fall/holiday merchandise. Cf. Vigneaux v. Carriere, 845 A.2d 304, 306 (R.I. 2004)("A note or memorandum satisfies the statute if it provides the '[identity] of the seller and the buyer, their respective intention to sell and to purchase, such a description of the subject matter of the sale ..., the purchase price, and the terms of payment ....'")(first alteration in original)(italics omitted).

**Conclusion**

For the foregoing reasons, I recommend that Defendant's Motion for Summary Judgment be granted. Any objections to this Report and Recommendation must be specific and must be filed with

the Clerk of Court within ten (10)[12] days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
February 14, 2007

[12] The ten days do not include intermediate Saturdays, Sundays, and legal holidays. See Fed. R. Civ. P. 6(a).