United States Court of Appeals, First Circuit.
GESTETNER CORPORATION, Plaintiff, Appellant,
v.
CASE EQUIPMENT COMPANY, Defendant, Appellee.
**No. 86-1312.**

Argued Dec. 4, 1986.
Decided March 31, 1987.

Distributor of office equipment brought suit against another equipment company for goods sold and delivered and not paid for. Defendant counterclaimed for breach of contract and breach of warranty. The United States District Court for the District of Maine, Gene Carter, J., entered judgment for distributor in the amount of $63,779.80 and for defendant in the amount of $225,600 on its breach of contract count and $24,155.93 on its breach of warranty count. Plaintiff appealed. The Court of Appeals, Bownes, Circuit Judge, held that: (1) statute of frauds did not preclude finding that plaintiff contracted with defendant to establish defendant as sole distributor of stencil duplicators adapted by the defendant to a newly developed printing process, and (2) lack of any reference to quantity of goods to be sold in letter confirming agreement and admission evidence which overcame statute of frauds defense did not preclude enforcement of agreement which was in nature of an exclusive dealing contract.

Affirmed.

See also, D.C., 108 F.R.D. 138.

West Headnotes

**[1] Frauds, Statute Of 185 ⚷127**

185 Frauds, Statute Of
185IX Operation and Effect of Statute
185k127 k. Writing Subsequent to Oral Agreement. Most Cited Cases

**Frauds, Statute Of 185 ⚷144**

185 Frauds, Statute Of
185IX Operation and Effect of Statute
185k144 k. Waiver of Bar of Statute; Estoppel. Most Cited Cases
Under Maine law, statute of frauds did not preclude finding that distributor of office equipment contracted to establish another equipment company as sole distributor of stencil duplicators adapted to a newly developed printing process, where distributor, by its president, admitted in testimony, and in pleadings, that a contract for sale of equipment had been made; moreover, letter from equipment company's patent lawyer to president of distributor constituted a writing confirming the contract. 11 M.R.S.A. § 2-201(2), (3)(b).

**[2] Sales 343 ⚷1(4)**

343 Sales
343I Requisites and Validity of Contract
343k1 Nature and Essentials of Contract for Sale of Personal Property in General
343k1(4) k. Certainty as to Subject-Matter. Most Cited Cases
Under Maine law, lack of any reference to quantity of goods to be sold in either letter confirming contract or in admission evidence which overcame statute of frauds defense did not preclude enforcement of exclusive dealing contract. 11 M.R.S.A. §§ 2-201(2), (3)(b), 2-306(2), 2-306 comment.

*807 S. David Harrison with whom McLaughlin & Stern, Ballen and Ballen, New York City, Andrew J. Bernstein and Bernstein, Shur, Sawyer & Nelson, Portland, Me., were on brief, for plaintiff, appellant.
Julian L. Sweet with whom Paul F. Macri, Valerie

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Stanfill and Berman, Simmons & Goldberg, P.A., Lewiston, Me., were on brief, for defendant, appellee.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.
BOWNES, Circuit Judge.
This is an appeal by plaintiff-appellant Gestetner Corporation (Gestetner) from a jury award and judgment on Count I of the counterclaim of defendant-appellee Case Equipment Company (Case). We affirm the judgment below.

The issue is whether the statute of frauds precludes finding that there was a contract for the sale of goods between the parties.

I.

Gestetner is the United States distributor of a line of office equipment, including stencil duplicators, commonly referred to as mimeograph machines. It uses a dual distribution system, consisting of company-owned retail stores and independent dealers, to sell its products.

In January, 1984, Anthony J. Casella, president of Case, began experimenting with stencil duplicators to develop a process using sublimation dyes as ink to produce full color heat transfers for application to garments, metal and acrylics. The use of sublimation dyes as ink overcame the color-fading problem common in other heat transfers. Casella found that Gestetner's stencil duplicators, with some modification, were suitable for use with the special sublimation ink he had developed. Casella called his process "Subli Color" printing.

In the spring of 1984, Casella contacted Gestetner about modifying and then selling its stencil duplicators as part of his color transfer process.
Gestetner began to sell stencil duplicators, parts and supplies to Case. No written contract was entered into between the parties. At first, things went well. Case was a good customer of *808 Gestetner. But starting in the fall of 1984, the relationship between the parties began to sour. Case refused to bring its past due account current. It claimed that it had received defective products which it could not sell. Gestetner refused to ship further products until the past due balance was paid. On May 29, 1985, Gestetner brought suit for goods sold and delivered and not paid for. Case counterclaimed in four counts: I, breach of contract; II, wrongful appropriation of the color transfer process; III, breach of warranty; and IV, fraudulently obtaining the color transfer process.

After the close of the evidence, Case agreed to the dismissal of Counts II and IV. Gestetner moved for a directed verdict on Count I on the ground that there was no evidence of a writing sufficient to satisfy the statute of frauds. The motion was denied. The jury returned a verdict for Gestetner in the amount of $63,779.80 and verdicts for Case on Count I of its counterclaim in the amount of $225,600, and on Count III in the amount of $24,155.93. Case has not appealed. Gestetner has appealed only the district court's refusal to direct a verdict for it on Count I of the counterclaim.[FN1]

FN1. Gestetner also appealed the denial of its motion for summary judgment. Since the motion was based on the statute of frauds, we affirm the district court's refusal to grant summary judgment for the reasons set forth herein.

II.

Gestetner's position is simple and straightforward: Because there was no evidence of a writing signed by it acknowledging the quantity of goods to be sold by it to Case, the statute of frauds bars the breach of contract claim.

Stripped to its essentials, Case's breach of contract claim is set forth in the counterclaim as follows:
10. In or about March, 1984, Case disclosed the details of the Subli Color process to Gestetner in confidence.
11. In consideration of this disclosure, Gestetner contracted with Case to establish Case as the sole distributor of Gestetner equipment packaged and adapted to Subli Color printing.
14. Gestetner has breached its contract with Case

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by the following acts, among others:
a) Gestetner has failed and refused to provide equipment to Case in a timely fashion[.]

The first question is whether Case successfully overcame the lack of a written contract and properly proved that Gestetner contracted "to establish Case as the sole distributor of Gestetner equipment packaged and adapted to Subli Color printing."

Section 2-201 of Maine's Uniform Commercial Code controls. The pertinent parts of that section are as follows:

**§ 2-201. Formal requirements: statute of frauds**

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

....

(b) if the party against whom enforcement is sought admits in his pleading, *809 testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted

....

Me.Rev.Stat.Ann. tit. 11, § 2-201.

The district court found that under (3)(b) of the Code, Gestetner by its president, Hector Wiltshire, admitted in testimony that a contract for sale had been made between Gestetner and Case and that the issue of whether or not there was such a contract and the terms of it would be submitted to the jury.

Comment 7 of the Code explains (3)(b):

7. If the making of a contract is admitted in court, either in a written pleading, by stipulation or by oral statement before the court, no additional writing is necessary for protection against fraud. Under this section it is no longer possible to admit the contract in court and still treat the Statute as a defense. However, the contract is not thus conclusively established. The admission so made by a party is itself evidential against him of the truth of the facts so admitted and of nothing more; as against the other party, it is not evidential at all.

We turn, therefore, to a review of the evidence on this issue. Since this is an appeal from a denial of a motion for a directed verdict, we must view the evidence and the reasonable inferences to be drawn therefrom in the manner most favorable to the party opposing the motion. *Insurance Company of North America v. Musa*, 785 F.2d 370, 372 (1st Cir.1986); *Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 885 (1st Cir.1978).

[1] It is undisputed that after Casella determined that Gestetner's stencil duplicators could be successfully adapted to his Subli Color printing process, he met with Richard Riggs, Gestetner's regional sales manager. Casella inquired whether Gestetner would establish Case as an independent dealer and give it the sole right to market modified Gestetner stencil duplicators as part of his color printing process. Riggs told Casella that he lacked authority to establish such a dealership. He relayed Casella's proposal to Richard Litton, national sales manager for Gestetner, who reported it to Hector Wiltshire, president of Gestetner. Thereafter, Gestetner began selling stencil duplicators to Case. No written contract was executed.

On September 11, 1984, patent counsel for Case wrote to Litton notifying Gestetner that Case reserved its domestic and foreign patent rights in the Subli Color process. The letter further stated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that Case looked forward "to its continuing role as exclusive dealer for Gestetner." Litton forwarded the letter to Wiltshire who directed that no response be made to it.

Wiltshire made the following admissions during the course of his testimony. He testified that he knew that Case intended to mechanically modify Gestetner stencil duplicators, rebox them and market them under another trade name. He stated that the relationship Gestetner had with Case was unique. He further testified that Case had been an independent dealer of Gestetner for a year and three months.

We agree with the district court that this testimony met the admission requirement of section 2-201(3)(b) of the Code.

Although the district court did not so expressly find, Gestetner's pleadings were also sufficient to trigger (3)(b). Paragraph 3 of its complaint states: "3. At Defendant's request and *in compliance with an agreement with Defendant*, Plaintiff sold and delivered to Defendant various goods and equipment as set forth and described in the invoices attached hereto collectively as Exhibit A." (Emphasis added.) The words "in compliance with an agreement" can only connote a contract for the sale of goods.

We also find, contrary to the district court, that the letter of September 11, 1984, from Case's patent lawyer to Gestetner met the requirements of section 2-201(2) of the Code. Comment 3 of the Code explains the effect to be given an unobjected to writing confirming a contract:

3. Between merchants, failure to answer a written confirmation of a contract *810 within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against both parties under subsection (1). The only effect, however, is to take away from the party who fails to answer the defense of the Statute of Frauds; the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected. Compare the effect of a failure to reply under Section 2-207.

*See also Apex Oil Company v. Vanguard Oil & Service Co., Inc.*, 760 F.2d 417, 422-23 (2d Cir.1985); *Thomson Printing Machinery Co. v. B.F. Goodrich Co.*, 714 F.2d 744, 746-48 (7th Cir.1983). Gestetner began to sell stencil duplicators to Case in the spring of 1984. Considering that no written contract had been made and that the relationship between the parties was a continuing one, a letter dated September 11 of the same year would meet the "reasonable time" requirement of section 2-201(2). The letter stated:Case Equipment Company has reserved its domestic and foreign patent rights in the new full color transfer printing process, and patent applications are, in preparation to secure Case Equipment Company patent rights in the process and apparatus. These pending patent rights are particularly applicable for use with the Gestetner Stencil Duplicator model 4170 and the Gestetner Electronic Stencil Immager model 1120. *Case Equipment therefore looks forward to its continuing role as exclusive dealer for Gestetner in the field of use of full color and multicolor sublimation transfer printing.* This field of use is coincident with Case Equipment Company's pending patent rights for the new full color tone scale transfer printing process and Case reserves this field for its own exclusive use. [Emphasis added.]

When asked about the meaning of the letter at trial, Wiltshire stated: "Its meaning is clear. Case expected to be the only dealer distributing the products." Wiltshire deliberately chose not to answer the letter. We see no reason why the letter did not meet the requirements of section 2-201(2) of the Code.

Based on the foregoing, we rule that the statute of frauds did not preclude a finding that Gestetner contracted to establish Case as the sole distributor of Gestetner equipment packaged and adapted to Subli Color printing.

[2] The next question is whether the lack of any reference to the quantity of goods to be sold in either the letter, admissible under section 2-201(2), or the admission evidence, properly admitted under section 2-201(3)(b) is fatal and precludes recovery.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Code states in section 2-201(1), that "the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing. " Essentially the same statement is contained in (3)(b). Although (2) does not contain similar wording, we think that a contract proved under this section would be subject to the same limitation.

Gestetner argues that the quantity term of the contract cannot be implied and that the district court erred in allowing the jury to decide whether there was an exclusivity contract under which Gestetner agreed to supply Case its requirements of stencil duplicators.

Our analysis starts with section 2-306 of the Code, which provides:

**§ 2-306. Output, requirements and exclusive dealings**

(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

*811 Subsection (1) applies to output and requirements contracts and subsection (2) applies to contracts for "exclusive dealing." Comment 2 under this section states in pertinent part:

2. Under this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure.

Under this commentary, it is clear that an output or requirements contract is enforceable even though no specific quantities are necessary or need to be supplied. *See* J. White and R. Summers, *Uniform Commercial Code,* § 3-8 at 122 (2d ed. 1980).

We recognize that the good faith obligation is not the same for a requirements contract and an exclusive dealing contract. Under a requirements contract the obligation is to use good faith in determining requirements. The good faith obligation under an exclusive dealing contract is for the seller to use "best efforts to supply the goods and the buyer to use best efforts to promote the sale. " *See Kubik v. J. & R. Foods of Oregon, Inc.*, 282 Or. 179, 577 P.2d 518, 520 (1978). We must note here that there was evidence from which it could be reasonably found that Gestetner did not use its best efforts to supply the goods and Case did use its best efforts to promote their sale.

At least two federal appellate courts have discussed the interplay between section 2-201 of the Code and section 2-306. In *Riegel Fiber Corp. v. Anderson Gin Company,* 512 F.2d 784 (5th Cir.1975), the issue was similar to the one before us: "whether the quantity term in the agreement was too indefinite to support judicial enforcement." *Id.* at 789. The court stated, "for the limited purposes of meeting the technical statute of frauds requirement embodied in section 2-201 the accuracy of the quantity term is immaterial." *Id.* Although the court did not reach the question of whether the contracts before it fell within the reach of section 2-306, it did note that this section was "the primary 'gap filler' in the Code for quantity terms." In a footnote, it cited to two cases in which the Georgia Supreme Court relied on section 2-306 in rejecting contentions that agreements were too indefinite to be enforced. *Id.* at 789-90, n. 13.

In *O.N. Jonas Co., Inc. v. Badische Corp.*, 706 F.2d 1161 (11th Cir.1983), the contract, which was established by evidence overcoming the defense of the statute of frauds, was analogous to an exclusive dealership agreement under section 2-306. The court held that since the evidence demonstrated that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

both parties intended a requirements contract based on the buyer's good faith needs, "the indefiniteness of the written quantity term does not invalidate the agreement." The court ended by observing: " Justice would be thwarted by denying enforceability upon the basis of a lack of a specific quantity. The Code was enacted to prevent just such an inequitable result." *Id.* at 1165.

Here, Case overcame the statute of frauds defense by the admission testimony of Gestetner's president, an admission in Gestetner's pleadings and the letter specifically referring to Case's role as exclusive dealer for Gestetner. [FN2] As already stated, this evidence was sufficient for a finding that Gestetner had established Case as the sole distributor for its stencil duplicators, as modified by Case, for sale as part of its Subli Color printing process. We realize that the district court allowed the jury to determine the existence of an exclusive dealership on the basis of all the evidence, including that of Casella, president of Case. Under our analysis of the interplay between***812** section 2-201 and section 2-306, that was not error.

FN2. This last finding is contrary to that of the district court but we can, of course, uphold a refusal to grant a directed verdict on grounds other than those relied upon by the district court.

We must point out, however, that on the basis of what Gestetner's president knew, it could be fairly inferred that Gestetner agreed to establish Case as an exclusive dealer. Wiltshire knew that Case was buying its stencil duplicators for use in Case's color printing process. He knew that the Gestetner equipment would be modified, repackaged and renamed before being sold. There is no evidence that Gestetner was selling equipment to any other dealer for such use. And Wiltshire admitted that Case was a dealer for over a year. It seems to us that once it was shown that Case was established as a dealer by Gestetner, and the evidence is beyond cavil on that, it ineluctably followed that the dealership had to be exclusive.

In any event, under either our view of the evidence or that of the district court, the motion for a directed verdict was properly denied.

*Affirmed.* Costs to appellee Case.

C.A.1 (Me.),1987.
Gestetner Corp. v. Case Equipment Co.
815 F.2d 806, 3 UCC Rep.Serv.2d 1328

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Robert D. Fine**

---

**From:** Charles Shifley [CShifley@bannerwitcoff.com]

**Sent:** Tuesday, March 27, 2007 4:47 PM

**To:** Richard D. Zimmerman; Robert D. Fine

**Cc:** MacAdams, Richard

**Subject:** Schramm and Litle Kids v. Imperial - More as to settlement, FRE 408

Richard and Bob: I've been meaning to get back to you about the products of the third paragraph of my letter of February 16th. You inquired about them as in the e-mail below. Imperial records indicate they've sold so little of these products that the total royalty in controversy is just over eight thousand dollars. We might disagree over expressions of infringement and lack of infringement, but not over low volume. Charles

---

**From:** Richard D. Zimmerman [mailto:RZimmerman@crfllp.com]
**Sent:** Tuesday, February 20, 2007 11:55 AM
**To:** Charles Shifley
**Subject:** Schramm and Litle Kids v. Imperial

Settlement Discussions subject to F.R.Evid. Rule 408

Charles,
I am reviewing the docs you sent Bob Fine with your 16 FEB 07 letter. Most are marked confidential, but it would help our discussions if the clients could review these documents. Can we disclose the confidential documents to our clients?

Also, your paragraph Third lists 6 products Imperial asserts should not be subject to payments because of product configuration relative to the '131 patent claims limitations. What are those limitations not found in the 6 products?

I view your letter and documents as a serious effort to resolve this matter and assure you that plaintiffs likewise will make a serious effort.

Regards,
Richard

Richard Zimmerman
401.453.6400